**BROOKS SHOE MANUFACTURING COMPANY, INC.**

v.

**UNITED TELEPHONE COMPANY.**

Civ. A. No. 83–5250.

United States District Court, E.D. Pennsylvania.

Jan. 6, 1984.

Kathryn Heidt, Duane, Morris, & Heckscher, Philadelphia, Pa., for plaintiff.

Barbara Sagar, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

The duly filed tariffs of United Telephone Company provide, in Tariff 6(a):

"Existing customers or applicants whose credit rating is or becomes unsatisfactory are required to make a deposit as security for payment of future bills when required to do so by the telephone company."

On or about September 1, 1981, having experienced some difficulty over a lengthy period in collecting its telephone bills from one of its subscribers, Brooks Shoe Manufacturing Company, Inc., United invoked this tariff provision, and notified Brooks that it would be required to make a substantial cash deposit to secure the payment of its future telephone bills. Negotiations between the parties ensued. United threatened to terminate Brooks' telephone service, and actually disconnected that service for a brief period on September 11, 1981. However, service was promptly resumed when, on that date, United received the agreed-upon deposit in the amount of $15,000 ("the Deposit").

On October 23, 1981, Brooks filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* (1979). In the meantime, between September 12, 1981 and October 23, 1981, Brooks had incurred additional charges for telephone service provided by United in the total amount of $15,343.64. As of October 23, 1981, the Deposit, including accrued interest at the agreed rate of 6% per annum, totaled $15,170.

In November 1981, United routinely applied the Deposit in reduction of the amount owed for pre-petition telephone service.[1] Later, however, threatened with contempt proceedings for violating the automatic stay provisions resulting from the filing of the bankruptcy petition, United "reversed" it bookkeeping entries, and acknowledged that it would hold the Deposit intact, subject to the direction of the Bankruptcy Court. Thus, at the present time, telephone charges incurred between September 12, 1981 and the date of bankruptcy, October 23, 1981, remain unpaid, and *United is* holding the Deposit, which now, with additional interest, is slightly in excess of $16,000.

The debtor instituted this adversary proceeding to compel United to return the Deposit. The bankruptcy judge, while exonerating United from the contempt charge, entered a turnover order, 32 B.R. 880, from which United has taken the present appeal.[2]

The Order appealed from is based upon essentially the following reasoning: The establishment of the deposit created a debt conditionally owed to the debtor by United. When, after bankruptcy, United attempted to use the deposit to reduce the outstanding bill for pre-bankruptcy telephone service, it acted improperly for two reasons: (1) the action violated the automatic stay provision; and (2) the action amounted to

---

1. As a condition of continuing to provide service after bankruptcy, United had obtained from the trustee a further deposit of $8,000. Presumably, the bills for post-petition telephone service were resolved to the satisfaction of all concerned. At any rate, no question concerning post-petition telephone service is presented in this case.

2. The order of the bankruptcy judge further provides that no claim of United against the debtor will be allowed unless and until the turnover order is complied with.

the exercise of a setoff which violated § 553 of the Bankruptcy Code. While the Code recognizes a general right of setoff, there is no such right with respect to debts (here, the Deposit) created less than 90 days before bankruptcy (when the debtor is presumed to have been insolvent) for the purpose of establishing a right of setoff.

United argues, on the contrary, that the Deposit amounted to the creation of a valid security interest, and United is entitled to retain the collateral; and that, even if the transaction should be deemed to involve a claim of setoff, United is entitled to exercise its right of setoff. United argues that the limitations of § 553 of the Bankruptcy Code apply only to debts created with the intention of establishing a right of setoff with respect to *antecedent* debts, and not to transactions for which "new value" was given.

For a variety of reasons, I have concluded that the Order appealed from must be reversed. It seems to me that, by focusing upon questions concerning the proper label to be affixed to the underlying transactions, the parties have overlooked the fundamental issue, namely, whether on the date the bankruptcy petition was filed, United owed the debtor $15,000 or any part thereof. The most that can be said is that, when the petition was filed, United was holding $15,000 of the debtor's money; but United's legal obligation to repay had not then arisen, and would not arise unless the outstanding bills for telephone service were paid.

In short, it is not at all clear to me that the situation involved setoff at all. Rather, it is more nearly akin to recoupment, which is plainly permitted by the Bankruptcy Code. That is, the distinction is between truly independent debts, which give rise to setoff rights, and reciprocal obligations arising from the same transaction or series of transactions, which give rise to recoupment. As noted in 4 Collier on Bankruptcy (15th ed), § 555.03, at p. 553–12:

"Recoupment, on the other hand, is the setting up of a demand arising from the *same transaction* as plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim. . . . Certainly in any suit for action between the estate and another, the defendant should be entitled to show that because of matters arising out of the transaction sued on, he is not liable in full for the plaintiff's claim. There is no element of preference here or of an independent claim to be offset, but merely an arrival at a just and proper liability on the main issue, and this would seem permissible without any reference to former § 68, or to § 553(a)."

Viewed realistically, the creation of the Deposit on September 11, 1981, seems virtually indistinguishable from the debtor's having paid in advance for its telephone service. There can be no question that the debtor was entitled to incur, and pay for, telephone service during the immediate prebankruptcy period, so long as the charges for such service were incurred in the ordinary course of the debtor's business.

Other possible analyses lead inexorably to the same result. By the terms of United's Tariff 6(a), by which both parties were bound, and which formed the entire basis for the Deposit arrangement, the Deposit stood *"as security* for payment of future bills." By obtaining possession of the Deposit, United perfected its security interest in the fund. Thus, if it were held that the parties did not intend the deposit to represent advance payment, at the very least it is clear that they intended to create a security interest therein; the Bankruptcy Court's finding to the contrary was clearly erroneous.

Or, if the Deposit created merely a debt, and the case be viewed as one of setoff, United should nevertheless be permitted to exercise its right of setoff. Section 553 of the Bankruptcy Code, read in conjunction with § 547 and in light of the legislative history, proscribes only preferential setoffs. This is not a situation in which United was attempting to gain an advantage over other unsecured creditors with respect to existing debts owed to United by the debtor. United gave "new value". It was not required to permit the debtor to run up

additional unsecured obligations for telephone service.

In the final analysis, plaintiff would have the right to require United to repay the $15,000 Deposit while pre-bankruptcy telephone bills in excess of that amount remained unpaid, only if United's defense (namely, that the conditions for refund have not been fulfilled, because the bills were not paid) would contravene some provision of the Bankruptcy Code or other applicable law. The establishment of the Deposit was a "transfer" which occurred within 90 days before bankruptcy, at a time when the debtor was presumptively insolvent, but it was not a voidable transfer because "new value" was received in exchange. The charges incurred by the debtor for telephone service between September 12 and October 23, 1981, were incurred in the ordinary course of business. Plaintiff has therefore not established a right of repayment, on this record.

It is appropriate to observe, in conclusion, that there are significant considerations of public policy which would be ill-served if the decision of the Bankruptcy Court in this case were upheld. Deposits as security for payment for future services are commonly required, in appropriate circumstances, by public utilities, landlords, and many other entities. To treat these transactions as merely laying the groundwork for preferential setoffs would, in the case of a public utility for example, expose the utility to the risk of being unable to obtain payment of its bills, should bankruptcy ensue within 90 days of the deposit. In turn, this would leave the utility little choice but to terminate service instead—an outcome which the Bankruptcy Code surely does not contemplate. Indeed, such a result would no doubt force into bankruptcy many firms which could avoid that step if permitted to operate normally during periods of financial difficulty.

In the present case, the defendant has argued that, in light of the judgment of the Bankruptcy Court, it cannot assure itself that its bills will be paid, and therefore would be forced to terminate the telephone service of every marginal subscriber. In response, the plaintiff presents only a very unsatisfactory suggestion: According to plaintiff, the utility could protect itself by segregating security deposits and thus "perfecting" its security interest. There is at least one reported decision which seems to suggest that segregation of such deposits is essential to the creation of a valid security interest, *Griffith v. Southwestern Bell Telephone Co. (In re. Voight)*, 24 B.R. 983 (Bkrtcy.N.D.Tex.1982). With deference, I find that decision unpersuasive. The accounting systems of public utilities are closely regulated. Under applicable regulations, segregation of security deposits is not required; and, in the context of the present dispute, it is difficult to perceive any useful purpose to be served by imposing that requirement.

It seems to me that much of the confusion engendered in this case is attributable to attempting to equate a security deposit such as that involved here with bank deposits. In the latter situation, the depositor has unfettered access to the funds at all times, and whatever obligation the bank might seek to set off is truly an independent debt. Even more importantly, such independent offsetting obligation would almost inevitably prove to have been an antecedent debt.

For the reasons set forth above, and in conformity with such cases as *In re. Atlanta Times Inc.*, 259 F.Supp. 820 (N.D.Ga. 1966), *aff'd sub nom. Sanders v. National Acceptance Co. of America*, 383 F.2d 606 (5th Cir.1967), and *Milin v. Allen (In re. Muntz TV, Inc.)*, 229 F.2d 228 (7th Cir. 1956), I have concluded that the judgment of the Bankruptcy Court is erroneous.

Although, as discussed above, I believe that United had the right to treat the Deposit as an advance payment, the fact remains that it was not so treated until after the bankruptcy petition was filed. Since United did attempt to exercise a right of setoff, and later rescinded that action and agreed to await the guidance of the Bankruptcy Court, it is appropriate to address the defendant's counterclaim, in which, among other things, it sought relief from the automatic stay so that it could lawfully

exercise its right of setoff. On the present record, it seems clear that this relief should have been granted. There is no "equity" interest of the debtor's estate in the deposit fund (creditors entitled to exercise a right of setoff are entitled to interest on the underlying claim; the September 12–October 23 telephone bills exceeded the amount of the Deposit).

The Order appealed from will be reversed.